## DEPARTMENT OF TRANSPORTATION

### Federal Transit Administration

### Notice of Meeting of the Transit Advisory Committee for Safety (TRACS)

**AGENCY:** Federal Transit Administration, DOT.

**ACTION:** Notice of meeting.

**SUMMARY:** This notice announces a public meeting of the Transit Advisory Committee for Safety (TRACS). TRACS is a Federal Advisory Committee established to provide information, advice and recommendations to the Secretary of the U.S. Department of Transportation and the Federal Transit Administrator on matters relating to the safety of public transportation systems.

**DATES:** The TRACS meeting will be held on March 29, 2016, from 8:30 a.m. to 5 p.m., and March 30, 2016, from 8:30 a.m. to 1 p.m. Contact Bridget Zamperini (see contact information below) by March 18, 2016, if you wish to be added to the visitor's list to gain access to the meeting.

**ADDRESSES:** The meeting will be held at the National Association of Home Builders, 1201 15th Street NW., Washington, DC 20005.

**FOR FURTHER INFORMATION CONTACT:** Bridget Zamperini, Office of Transit Safety and Oversight (TSO), Federal Transit Administration, 1200 New Jersey Avenue SE., Washington, DC 20590–0001 (telephone: 202–366–0306; or email: *TRACS@dot.gov*).

**SUPPLEMENTARY INFORMATION:** This notice is provided in accordance with the Federal Advisory Committee Act (Pub. L. 92–463, 5 U.S.C. App. 2). TRACS is composed of 29 members representing a broad base of expertise necessary to discharge its responsibilities. The tentative agenda for the March 29–30, 2016 meeting of TRACS is set forth below:

### Agenda

(1) Introductory Remarks
(2) Facility Use/Safety Briefing
(3) Welcome New Members
(4) Updates from the FTA Office of Transit Safety and Oversight
(5) Issuance of New Tasks
(6) Work Group Discussions
(7) Public Comments
(8) Summary of Deliverables/ Concluding Remarks

Members of the public wishing to attend and/or make an oral statement and participants seeking special accommodations at the meeting must contact Bridget Zamperini by March 18, 2016.

Members of the public may submit written comments or suggestions concerning the activities of TRACS at any time before or after the meeting at *TRACS@dot.gov,* or to the U.S. Department of Transportation, Federal Transit Administration, Office of Transit Safety and Oversight, Room E45–310, 1200 New Jersey Avenue SE., Washington, DC 20590. Attention: Bridget Zamperini.

Information from the meeting will be posted on FTA's public Web site at *http://www.fta.dot.gov,* on the TRACS Meeting Minutes page. Written comments submitted to TRACS will also be posted at the above web address.

Issued under the authority delegated at 49 CFR 1.91.

**Therese W. McMillan,**
*Acting Administrator.*

[FR Doc. 2016–05416 Filed 3–10–16; 8:45 am]

**BILLING CODE P**

## DEPARTMENT OF TRANSPORTATION

### National Highway Traffic Safety Administration

**[Docket No. NHTSA–2015–0095; Notice 2]**

### NHTSA Enforcement Guidance Bulletin 2015–01: Recommended Best Practices for Protective Orders and Settlement Agreements in Civil Litigation

**AGENCY:** National Highway Traffic Safety Administration (NHTSA), Department of Transportation.

**ACTION:** Final notice.

**SUMMARY:** NHTSA's ability to identify and define safety-related motor vehicle defects relies in large part on manufacturers' self-reporting. However, although federal regulations may require them to report certain information to NHTSA, manufacturers do not always do so, or do not do so in a timely manner. Additionally, the information a manufacturer is required to report varies greatly depending on the product and company size and purpose. Given these constraints, safety-related information developed or discovered in private litigation is an important resource for NHTSA.

This Enforcement Guidance Bulletin sets forth NHTSA's recommended guiding principles and best practices to be utilized in the context of private litigation. To the extent protective orders, settlement agreements, or other confidentiality provisions prohibit information obtained in private litigation from being transmitted to NHTSA, such limitations are contrary to Rule 26 of the Federal Rules of Civil Procedure, its state corollaries, and sound principles of public policy. Although such restrictions are generally prohibited by applicable rules and law, the Agency recommends that litigants include a specific provision in any protective order or settlement agreement that provides for disclosure of relevant motor vehicle safety information to NHTSA, regardless of any other restrictions on the disclosure or dissemination of such information.

**FOR FURTHER INFORMATION CONTACT:** Kara Fischer, Office of the Chief Counsel, NCC–100, National Highway Traffic Safety Administration, 1200 New Jersey Avenue SE., Washington, DC 20590 (telephone: 202–366–8726).

**SUPPLEMENTARY INFORMATION:** On September 21, 2015, NHTSA published a proposed Enforcement Guidance Bulletin setting forth what the Agency had identified as best practices for private litigants utilizing protective orders and settlement agreements with confidentiality provisions. Recognizing the public interest in this topic, the Agency solicited public comment before issuing a final Enforcement Guidance Bulletin. In response to this request for comment, the Agency received 124 public submissions. Although several comments were submitted after the stated closing date of October 19, 2015, all comments submitted to the **Federal Register** were considered in formulating this final Enforcement Guidance Bulletin regarding the use of confidentiality provisions in private litigation.

While the majority of comments fully supported the Enforcement Guidance as drafted, some opined that the guidance was unnecessary as manufacturers are already required to report certain information to the Agency, and noted that NHTSA possesses the power to request additional information from manufacturers through its investigative authority. However, in order to fully exercise its regulatory authorities and powers, the Agency must be made aware of the need to do so in the first instance. Both Agency experience and that of several other commenters provide several examples of a manufacturer failing to accurately and timely report relevant safety-related information to NHTSA. The Agency cannot request such information from the manufacturer if it is not first made aware of potential underlying safety-related issues.

Several comments also suggested that NHTSA adopt specific language that could be utilized in protective orders and settlement agreements. Because the facts and circumstances leading to

protective orders and settlement agreements vary, the Agency realizes that best practices may likewise vary depending on circumstance. Therefore, to the extent this Guidance contains any ''suggested'' or exemplar language, it is just that—suggested. The Agency is not endorsing any specific format or language that could be utilized. Such a determination is best made by the parties based on the particular facts and circumstances of a case. In addition, it also falls squarely within the ambit of judicial discretion to determine whether a confidentiality provision meets the requirements embodied by applicable law and policy.

A number of comments also discussed a legitimate concern regarding the dissemination of proprietary information. Preliminarily, it should be noted that protective orders and settlement agreements are not used solely to prevent the dissemination of alleged proprietary information. Although certain commenters disclaimed knowledge of such situations, a number of commenters provided the Agency with specific statements and examples from individuals who have been precluded from sharing any information at all with NHTSA due to overbroad confidentiality restrictions. Indeed, settlement agreements often require that the parties not discuss the underlying facts or allegations of the case. Therefore, the Agency respectfully disagrees with any notion that NHTSA could request the information from the manufacturer after a plaintiff or other party informs NHTSA of potential safety defects or concerns.

In issuing this guidance, the Agency is not requesting or advocating for the submission or provision of any particular information or documentation in every case. However, in matters that concern the safety of the American driving public and pedestrians, entities and individuals must be permitted to disclose relevant information to the Agency commanded by Congress to ensure that safety. Private litigants should tailor the use of confidentiality provisions in a way that protects legitimate proprietary interests while still allowing for the provision of relevant information to NHTSA; the parties themselves are in the best position to determine how that can be accomplished. Should the parties reach an impasse, they can of course make application to the court for appropriate relief. Given the global interest in protecting and promoting public safety, the Agency is confident that private litigants can and will agree on appropriate processes or procedures that may be implemented to address any concerns regarding the dissemination of proprietary information.

Several commenters also proposed expanding this guidance to allow for broader sharing of information and documents discovered through litigation. While it is true that entities and individuals other than NHTSA may have an interest in safety-related information generated in litigation, the focus of this guidance is solely the disclosure of safety information to NHTSA pursuant to its authority and responsibility. This Enforcement Guidance does that and, hence, is appropriately tailored.

The Agency reiterates that in issuing this Enforcement Guidance, NHTSA is not imposing new or additional reporting requirements. As previously explained, this Enforcement Guidance Bulletin is fully supported by existing law and policy. This Guidance communicates the Agency's position that confidentiality provisions should not be used to prevent safety-related information from reaching NHTSA. The Agency is not endorsing or condoning any particular approach—judicial, legislative, regulatory, or otherwise.

In light of the foregoing, and after giving full consideration to the concerns and views expressed in the submitted comments, and as informed by the Agency's judgment and expertise, NHTSA provides the following Enforcement Guidance for private litigants pertaining to the use of confidentiality provisions in protective orders and settlement agreements:

**Enforcement Guidance**

The National Highway Traffic Safety Administration (''NHTSA'' or ''the Agency'') is tasked with, among other things, setting Federal Motor Vehicle Safety Standards (''FMVSS''), identifying and ensuring the remedy of safety-related defects, and monitoring and enforcing compliance with these standards to safeguard the well-being of the American public. The only way the Agency can fully achieve these objectives is if it has access to all necessary information, including information discovered or identified in private litigation.

NHTSA's ability to identify and define safety-related motor vehicle defects relies in large part on timely and accurate reporting by manufacturers, suppliers, and various parties throughout the industry, whether by statutory or regulatory requirement or pursuant to compulsory process. Although federal law may require industry participants to report certain information to NHTSA, they do not always do so, or do not do so in a timely manner. Additionally, the type of information an industry participant is required to report varies greatly depending on the product and company size and purpose. While certain entities are required to report both deaths and injuries resulting from the use of their products, others only must report deaths. In those cases, in the absence of a fatal incident a potentially defective product may not come to NHTSA's attention until numerous people have sustained serious injury—if it ever reaches NHTSA at all.

Given these constraints, safety-related information developed or discovered in private litigation is an important resource for NHTSA. Yet confidentiality restrictions imposed as part of a protective order or settlement agreement in private litigation—whether court-sanctioned or privately negotiated—often prevent parties from providing information about potentially dangerous products to the Agency. As many scholarly articles have noted, and as history has borne out, such restrictions have kept critical safety information out of the hands of both regulators and the public. As a matter of law and sound public policy, NHTSA cannot countenance this situation.

It is well-established that confidentiality provisions, protective orders, and the sealing of cases are appropriate litigation tools in some circumstances. In most instances, however, the interests of public health and safety will trump any confidentiality interests that might be implicated. In matters that concern the safety of the American driving public and pedestrians, it is important that entities and individuals are not prevented from providing relevant information to the very Agency tasked with ensuring that safety.

To the extent protective orders, settlement agreements, or other confidentiality provisions prohibit motor vehicle safety-related information from being transmitted to NHTSA, such limitations are contrary to established principles of public policy and law, including Rule 26 of the Federal Rules of Civil Procedure and its state corollaries which require a showing of good cause to impose confidentiality. The recent General Motors ignition switch and Takata airbag recalls are but two examples of how vital early identification of motor vehicle risks or defects is for the safety and welfare of the American public.

To further the important public policies discussed above, the Agency encourages and recommends that parties and courts seek to include a

provision in any protective order or settlement agreement that—despite other restrictions on confidentiality—specifically allows for disclosure of relevant motor vehicle safety information to NHTSA and other appropriate government authorities.

**I. Legal and Policy Background**

"Once a matter is brought before a court for resolution, it is no longer solely the parties' case, but also the public's case." *Brown* v. *Advantage Eng'g, Inc.,* 960 F.2d 1013, 1016 (11th Cir. 1992). As a general rule, the public is permitted "access to litigation documents and information produced during discovery." *Phillips* v. *Gen. Motors Corp.,* 307 F.3d 1206, 1210 (9th Cir. 2002). Where there is a presumptive right of public access under the federal rules, courts have discretion upon a showing of "good cause" to restrict access to documents or information "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). As the Seventh Circuit has stated, Rule 26(c)'s good cause requirement means that, "[a]s a general proposition, pretrial discovery must take place in the public unless compelling reasons exist for denying the public access to the proceedings." *Am. Telephone and Telegraph Co.* v. *Grady,* 594 F.2d 594, 596 (7th Cir. 1978); *see also, Public Citizen* v. *Liggett Group, Inc.,* 858 F.2d 775, 790 (1st Cir. 1988). Trial courts enjoy broad discretion in determining when to issue a protective order and the degree and scope of protection required. *Seattle Times Co.* v. *Rhinehart,* 467 U.S. 20, 36 (1984).

General allegations of harm, unsubstantiated by specific examples or articulated reasoning, however, are insufficient to warrant such an order. *Beckman Indus., Inc.* v. *Int'l Ins. Co.,* 966 F.2d 470, 476 (9th Cir. 1992); *Cipollone* v. *Liggett Group, Inc.,* 785 F.2d 1108, 1121 (3d Cir. 1986). Rather, the burden is on the party seeking protection from disclosure to "allege specific prejudice or harm" that will result if the protective order is not granted. *In re Roman Catholic Archbishop of Portland in Oregon,* 661 F.3d 417, 424 (9th Cir. 2011), *cert. denied,* 132 S. Ct. 1867 (2012); *In re Terra Intern., Inc.,* 134 F.3d 302 (5th Cir. 1998) (good cause requirement contemplates a particular and specific demonstration of fact as distinguished from conclusory statements); *Glenmeade Trust Co.* v. *Thompson,* 56 F.3d 476 (3d Cir. 1995) (generalized allegations of injury insufficient to satisfy the good cause requirement for issuance of protective order); *Iowa Beef Processors, Inc.* v. *Bagley,* 601 F.2d 949, 954 n. 5 (8th Cir. 1979) (party seeking protective order bears burden of making "good cause" showing that the information being sought falls within scope of Rule 26(c) and that moving party will be harmed by its disclosure).

Even if a court concludes that such harm will result from disclosure, it still must proceed to balance "the public and private interests to decide whether a protective order is necessary." *Phillips,* 307 F.3d at 1211. *See Shingara* v. *Skiles,* 420 F.3d 301, 308 (3d Cir. 2005) ("[A] court always must consider the public interest when deciding whether to impose a protective order."); *Glenmede Trust Co.* v. *Thompson,* 56 F.3d 476, 483 (3d Cir. 1995) ("[T]he analysis [of good cause] should always reflect a balancing of private versus public interests."). In doing so, courts consider a number of factors, including:

(1) whether disclosure will violate any privacy interests; (2) whether the information is being sought for a legitimate purpose or for an improper purpose; (3) whether disclosure of the information will cause a party embarrassment; (4) whether confidentiality is being sought over information important to public health and safety; (5) whether the sharing of information among litigants will promote fairness and efficiency; (6) whether a party benefitting from the order of confidentiality is a public entity or official; and (7) whether the case involves issues important to the public.

*Glenmede Trust Co.,* 56 F.3d at 483. *See also In re Roman Catholic Archbishop of Portland in Oregon,* 661 F.3d at 424.

The public's interest in access to court records is strongest when the records concern public health or safety. *See, e.g., Brown & Williamson Tobacco Corp.* v. *F.T.C,* 710 F.2d 1165, 1180–81 (6th Cir. 1983) (vacating district court's sealing of court records involving the content of tar and nicotine in cigarettes and emphasizing that the public had particularly strong interest in the court records at issue because the "litigation potentially involves the health of citizens who have an interest in knowing the accurate 'tar' and nicotine content of the various brands of cigarettes on the market"); *see also United States* v. *General Motors,* 99 FRD. 610, 612 (D.D.C. 1983) (the "greater the public's interest in the case the less acceptable are restraints on the public's access to the proceedings"); *In re Air Crash at Lexington, Ky., August 27, 2006,* No. 5:06–CV–316–KSF, 2009 WL 16836289, at *8 (E.D. Ky. June 16, 2009) (noting the "public has an interest in ascertaining what evidence and records the . . . Court [has] relied upon in reaching [its] decisions," and that "the public interest in a plane crash that resulted in the deaths of forty-nine people is quite strong, as is the public interest in air safety"). In balancing the privacy interests of the party seeking protection, a court "must consider the need for public dissemination, in order to alert other consumers to potential dangers posed by the product." *Koval* v. *Gen. Motors Corp.,* 62 Ohio Misc. 2d 694, 699, 610 NE.2d 1199, 1202 (Com. Pl. 1990) (citing *Hendricks* v. *Jeep Corp.* (D. Mont. June 3, 1986), case No. CV–82–092–M–PGH (unreported) and *United States* v. *Hooker Chemicals & Plastics Corp.,* 90 FRD. 421 (W.D.N.Y. 1981)).

A number of states have enacted "Sunshine in Litigation" acts, which thrust the interests of public health and safety into the forefront by preventing parties from concealing safety hazards through settlement agreements or protective orders. Some, such as Florida, broadly forbid courts from entering protective orders that may have the "purpose or effect of concealing a public hazard or any information concerning a public hazard" or that "may be useful to members of the public in protecting themselves from injury." Fla. Stat. Ann. § 69.081 (West 2015). Others, such as Texas, establish a presumption that court records—including all documents filed with the court, unfiled settlement agreements, and unfiled discovery documents "concerning matters that have a probable adverse effect upon the general public health or safety"—are open to the general public; records may be sealed only upon a showing that there is a specific, serious, and substantial interest in nondisclosure which clearly outweighs the presumption of public access and any probable effect on public health or safety. Tex. R. Civ. P. 76a.

A federal corollary introduced on May 14, 2015, currently pending before the House of Representatives, H.R. 2336 (114th Congress, 2015–2017), would create a presumption against protective orders and the sealing of settlements and cases "in which the pleadings state facts that are relevant to the protection of public health or safety." The presumption would control unless a party asks a judge to find that a specific and substantial interest in maintaining secrecy outweighs the public health and safety interest and that the order is no broader than necessary to protect the privacy interest asserted. *Id.* It would also prohibit a court from approving or enforcing a provision that restricts a party from disclosing public health or safety information to any federal or state agency with authority to enforce laws regulating an activity related to such information. *Id.*

Several states have taken a broader approach, enacting statutes and court rules to address the question of whether or not courts should enforce confidentiality agreements, regardless of the subject matter. The common theme of these statutes is a balancing of interests. For example, drawing upon federal precedent requiring consideration of the public interest at stake, Idaho Court Administrative Rule 32 directs courts considering shielding requests to first determine whether the interest in privacy or public disclosure predominates and to ''fashion the least restrictive exception from disclosure consistent with privacy interests.'' Idaho R. Admin. 32(f). *See also* Mich. Ct. R. 8.119(F) (records may be sealed upon showing of good cause and that no less restrictive means are available to protect the interest asserted); D.S.C. LCivR 5.03 (party must state why sealing is necessary and explain why less restrictive alternatives will not afford adequate protection). Indiana's legislature went a step further, requiring an affirmative showing that a public interest will be protected by sealing a record, and mandating that records shall be unsealed as soon as possible after the reason for sealing them no longer exists. Ind. Code § 5–14–3–5.5 (2011). *See also*, Richard Rosen, *Settlement Agreements in Com. Disputes,* n. 103 § 10.04 (2015) (citing to statutory provisions in California, Colorado, Michigan, Montana, New Hampshire, New York, Ohio, Oregon, South Carolina, and Utah). Although the specifics of each provision vary, all are consistent with the notion that the safety of the public should be given considerable weight in determining whether to restrict access to information.

Basic contract principles also dictate that the public health and safety concern should be of paramount significance in drafting and approving protective orders and settlement agreements. While parties are generally free to contract as they see fit, ''courts will not hesitate to declare void as against public policy contractual provisions which clearly tend to the injury of the public in some way.'' 17A C.J.S. Contracts § 281 (2015) (internal citations omitted); *see Thomas James Associates, Inc.* v. *Jameson,* 102 F.3d 60, 66 (2d Cir. 1996) (''[C]ourts must not be timid in voiding agreements which tend to injure the public good or contravene some established interest of society.'') (internal quotations and citations omitted); *see also Vasquez* v. *Glassboro Service Ass'n, Inc.,* 83 N.J. 86, 415 A.2d 1156 (1980) (citing text for general proposition that courts have broad power to declare agreements violative of public policy).

''While the term 'public policy' lacks precise definition, . . . it may be stated generally as a legal principle which holds that no one may lawfully do that which has a tendency to injure the public welfare. . . .'' *O'Hara* v. *Ahlgren, Blumenfeld and Kempster,* 537 NE.2d 730 (Ill. 1989). ''An agreement is against public policy if it is injurious to the interests of the public, contravenes some established interest of society, violates some public statute, is against good morals, tends to interfere with the public welfare or safety, or is at war with the interests of society or is in conflict with the morals of the time.'' *E & B Mktg. Enterprises, Inc.* v. *Ryan,* 568 NE.2d 339, 209 Ill. App. 3d 626 (1st Dist. 1991). *See also Johnson* v. *Peterbilt of Fargo, Inc.,* 438 NW.2d 162 (N.D. 1989) (''Public policy, with respect to contract provisions, is a principle of law whereby a contract provision will not be enforced if it has a tendency to be injurious to the public or against the public good.''). An agreement is unenforceable if the interest in its enforcement is outweighed by the public policy harmed by enforcement of the agreement. 17A C.J.S. Contracts § 281 (citation omitted).

In fact, the Florida Sunshine in Litigation Act specifically codifies this concept: ''Any portion of an agreement or contract which has the purpose or effect of concealing a public hazard, any information concerning a public hazard, or any information which may be useful to members of the public in protecting themselves from injury which may result from the public hazard, is void, contrary to public policy, and may not be enforced.'' Fla. Stat. Ann. § 69.081(4). *See also* Ark. Code Ann. § 16–55–122 (2011) (rendering void any settlement provision purporting to restrict disclosure of an environmental hazard). Although the Florida provision broadly addresses any contract, this notion is particularly applicable in the context of protective orders or settlement agreement terms that prevent litigants from disclosing information to NHTSA.

The good cause requirements found in Rule 26 and related state provisions, and the doctrines underlying NHTSA's own regulations all advance the important public policy of maintaining and preserving the health and welfare of the public. This strong policy has been realized and enforced by the refusal of many courts and litigants to engage in protective orders or settlement agreements that keep regulators and the public in the dark about potential safety hazards. *See Culinary Foods, Inc.* v. *Raychem Corp.,* 151 F.R.D. 297 (N.D. Ill.), *clarified* 153 F.R.D. 614 (1993) (any information as to whether products liability defendant's products were dangerous, and whether defendant knew of dangers and either failed to take action or attempted to conceal information, would not be encompassed by protective order under discovery rule); *Cipollone* v. *Liggett Group, Inc.,* 113 F.R.D. 86, 87 (D.N.J. 1986) (''Discovery may well reveal that a product is defective and its continued use dangerous to the consuming public. . . . It is inconceivable to this court that under such circumstances the public interest is not a vital factor to be considered in determining whether to further conceal that information and whether a court should be a party to that concealment.''); *Toe* v. *Cooper Tire & Rubber Co.* (Iowa District Court, Polk County, No. CL 106914) (Order on Defendant's Motion to Continue Protective Order, Jan. 18, 2012) (unsealing transcript where confidential documents related to tire defect were discussed). *See also, Ohio Valley Envtl. Coal.* v. *Elk Run Coal Co., Inc.,* 291 F.R.D. 114 (S.D.W.Va. 2013) (good cause did not exist for issuance of protective order in environmental group's suit against company because there was no specific showing of identifiable harm company would suffer and case involved issues of importance to public health and safety); *In re Roman Catholic Archbishop of Portland in Oregon,* 661 F.3d 417 (9th Cir.), *cert. denied,* 132 S. Ct. 1867 (2011) (private interest in nondisclosure was not outweighed by public interests in protecting public safety).

## II. Recommended Best Practices

Consistent with the foregoing legal and policy background, it is NHTSA's position that protective orders and settlement agreements should not be used to withhold critical safety information from the Agency, either intentionally or unintentionally. This is not to say that parties should not enter into these agreements. To the contrary, these tools are often necessary to promote full and complete disclosure, to prevent abuses of the discovery process, and to protect legitimate privacy and proprietary interests. However, as explained above, they cannot be used to preclude the disclosure of relevant safety-related information to regulatory agencies and other government authorities. To do so is contrary to the underlying law and policies inherent in Rule 26 and state corollaries, and against sound public policy.

NHTSA recommends that all parties seek to include a provision in any protective order or settlement agreement

that—despite whatever other restrictions on confidentiality are imposed, and whether entered into by consent or judicial fiat—specifically allows for disclosure of relevant motor vehicle safety information to NHTSA and other applicable governmental authorities. Such a provision could be stated generically, providing that nothing in the order or agreement shall be construed to prohibit either party from disclosing information to a regulatory agency or governmental entity who has an interest in the subject matter of the underlying suit. For example, the provision could state that ''discovery material may only be disclosed to . . . governmental entities with an interest in the public safety hazards involving [description of product/vehicle].'' Or, it could specifically address NHTSA's interest, as contemplated by the recent NHTSA Consent Order requiring Chrysler to ''develop and implement a plan ensuring that, in safety-related litigation, FCA US uses its best efforts to include in any protective order, settlement agreement, or equivalent, a provision that explicitly allows FCA US to provide information and documents to NHTSA.'' *See* In re: FCA US LLC, AQ14–003, July 24, 2015 Consent Order, Attachment A, p. 27 at ¶ (B)(12), available at *www.safercar.gov/rs/chrysler/pddfs/FCA_Consent_Order.pdf*. Private litigants should tailor the use of confidentiality provisions in a way that protects legitimate proprietary interests while still allowing for the provision of relevant information to NHTSA. The Agency is not endorsing any particular language that should be utilized; the parties themselves are in the best position to determine how that can be accomplished. Given the global interest in protecting and promoting public safety, the Agency is confident that in employing the use of confidentiality provisions, private litigants can and will agree on appropriate processes or procedures that may be implemented to address any concerns regarding the dissemination of proprietary information.

Whatever the language, confidentiality agreements and protective orders should not be utilized to prevent the parties from providing information that implicates public safety to the very entity charged with ensuring and protecting that safety. Instead, such orders and agreements should clearly authorize and facilitate the disclosure of safety-related information to NHTSA. Such a provision is consistent with, and in some cases mandated by, federal and state statutory schemes and regulations and applicable case law, and is wholly in line with principles of sound public policy.

*Applicability/Legal Statement:* This Enforcement Guidance Bulletin sets forth NHTSA's current interpretation and thinking on this topic and guiding principles and best practices to be utilized in the context of private litigation. This Bulletin is not a final agency action and is intended as guidance only. This Bulletin is not intended, nor can it be relied upon, to create any rights enforceable by any party against NHTSA, the Department of Transportation, or the United States. Moreover, these recommended practices do not establish any defense to any violations of the statutes and regulations that NHTSA administers. This Bulletin may be revised in writing without notice to reflect changes in NHTSA's evaluation and analysis, or to clarify and update text.

**Authority:** 49 U.S.C. 30101, *et seq.;* delegations of authority at 49 CFR 1.95(a), 501.2(a)(1), 501.5.

Issued: February 29, 2016.

**Mark R. Rosekind,**
*Administrator.*
[FR Doc. 2016–05522 Filed 3–10–16; 8:45 am]
**BILLING CODE 4910–59–P**

---

## DEPARTMENT OF TRANSPORTATION

### Intelligent Transportation Systems Program Advisory Committee; Notice of Meeting

**AGENCY:** ITS Joint Program Office, Office of the Assistant Secretary for Research and Technology, U.S. Department of Transportation.

**ACTION:** Notice.

The Intelligent Transportation Systems (ITS) Program Advisory Committee (ITSPAC) will hold a meeting on March 31, 2016, from 8:00 a.m. to 4:00 p.m. (EDT) in the Crystal Gateway Marriott Hotel, 1700 Jefferson Davis Highway, Arlington, VA 22202.

The ITSPAC, established under Section 5305 of Public Law 109–59, Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users, August 10, 2005, and re-established under Section 6007 of Public Law 114–94, Fixing America's Surface Transportation (FAST) Act, December 4, 2015, was created to advise the Secretary of Transportation on all matters relating to the study, development, and implementation of intelligent transportation systems. Through its sponsor, the ITS Joint Program Office (JPO), the ITSPAC makes recommendations to the Secretary regarding ITS Program needs, objectives, plans, approaches, content, and progress.

The following is a summary of the meeting tentative agenda: (1) Welcome, (2) Discussion of the FAST Act, (3) Discussion of Potential Advice Memorandum Topics, (4) Summary and Adjourn.

The meeting will be open to the public, but limited space will be available on a first-come, first-served basis. Members of the public who wish to present oral statements at the meeting must submit a request to *ITSPAC@dot.gov,* not later than March 24, 2016.

Questions about the agenda or written comments may be submitted by U.S. Mail to: U.S. Department of Transportation, Office of the Assistant Secretary for Research and Technology, ITS Joint Program Office, Attention: Stephen Glasscock, 1200 New Jersey Avenue SE., HOIT, Washington, DC 20590 or faxed to (202) 493–2027. The ITS JPO requests that written comments be submitted not later than March 24, 2016.

Notice of this conference is provided in accordance with the Federal Advisory Committee Act and the General Services Administration regulations (41 CFR part 102–3) covering management of Federal advisory committees.

Issued in Washington, DC, on the 7th day of March, 2016.

**Stephen Glasscock,**
*Designated Federal Officer, ITS Joint Program Office.*
[FR Doc. 2016–05413 Filed 3–10–16; 8:45 am]
**BILLING CODE 4910–22–P**

---

## DEPARTMENT OF TRANSPORTATION

### Office of the Secretary of Transportation

### Letters of Interest for Credit Assistance Under the Transportation Infrastructure Finance and Innovation Act (TIFIA) Program

**AGENCY:** Office of the Secretary of Transportation (OST), U.S. Department of Transportation (the DOT), Federal Highway Administration (FHWA), Federal Railroad Administration (FRA), Federal Transit Administration (FTA), Maritime Administration (MARAD).

**ACTION:** Notice of funding availability and request for comments.

**SUMMARY:** Pursuant to the recently enacted Fixing America's Surface Transportation Act (the FAST Act), the DOT announces the availability of